IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **DENISE DAHMS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | No. 19 C 6349 |
| | ) | |
| v. | ) | Judge Jorge L. Alonso |
| | ) | |
| **COLOPLAST CORP.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

In this products liability action, plaintiff Denise Dahms asserts claims arising out of injuries she suffered following the surgical implantation of defendant Coloplast Corp.'s Restorelle DirectFix polypropylene pelvic mesh product. Defendant moves for summary judgment, contending, among other things, that plaintiff's claims are time-barred. For the following reasons, the Court grants defendant's motion for summary judgment.

## BACKGROUND

In October 2013, suffering from symptoms of pelvic organ prolapse and stress urinary incontinence, plaintiff elected to undergo a surgical procedure to implant defendant's Restorelle DirectFix device, a polypropylene mesh product designed to correct the prolapse by reinforcing the pelvic floor. Dr. Raja Chatterji performed the surgery at a hospital in Elgin, Illinois, on October 24, 2013. Following a subsequent examination on September 18, 2015, Dr. Chatterji diagnosed plaintiff with a recurrence of her pelvic organ prolapse and a small erosion of her vaginal mesh. Plaintiff understood this to mean that her first surgery "didn't hold up." (Def.'s LR 56.1 Resp. ¶ 11, ECF No. 89; *see* Pl.'s LR 56.1 Resp. and Stmt. of Add'l Facts ¶ 1, ECF No. 121.) Dr. Chatterji scheduled plaintiff for surgery on January 7, 2016, to revise the exposed vaginal mesh and to repair

her recurrent prolapse by performing a procedure known as a robotic sacrocolpopexy, which involved the implantation of additional mesh. Plaintiff required additional surgeries on April 3, 2017, and April 24, 2018, to treat recurrent pelvic organ prolapse and mesh erosion. Plaintiff continues to experience symptoms, including pain, urinary tract infections, and urinary voiding dysfunction. Some of her symptoms predated the surgeries, but others, including pain, did not. (*See, e.g.,* Def.'s Mot. for Summ. J., Ex. 9, Pl.'s Dep. at 104:3-18, ECF No. 87-10.)

Plaintiff originally filed this case on April 25, 2018, in the United States District Court for the Southern District of West Virginia, as part of coordinated pretrial proceedings assigned to a judge of that district by the Judicial Panel on Multidistrict Litigation ("MDL"). Following discovery, the MDL judge transferred the case to this district, finding that it and certain like cases "would be more expeditiously concluded in the venues from which they arise." (Sep. 10, 2019 Transfer Order at 1, ECF No. 50.) Defendant has moved for summary judgment.[1]

## DISCUSSION

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Wackett v. City of Beaver Dam*, 642 F.3d 578, 581 (7th Cir. 2011). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court may not weigh conflicting evidence or make credibility determinations, but the party opposing summary judgment must point to competent evidence that would be admissible at trial to demonstrate a genuine dispute of material fact. *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705

---

[1] The parties have also filed numerous *Daubert* motions to bar expert testimony, but neither party refers to or relies on the proposed expert testimony in the Local Rule 56.1 statements and responses, so the Court need not resolve the *Daubert* motions to resolve the motion for summary judgment.

(7th Cir. 2011); *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013). The Court construes all facts and draws all reasonable inferences in favor of the nonmoving party. *Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016).

Plaintiff initially asserted her claims against defendant in fifteen counts. (Am. Short Form Compl., ECF No. 16; *see* 2d Am. Long Form Master Compl., ECF No. 52-7.) She has abandoned or conceded all but five substantive claims: negligence in failure to warn of dangerous defects (Count I), negligence in defective design (Count II), strict liability for failure to warn (Count IV), negligent infliction of emotional distress (Count XII), and unjust enrichment (Count XV). Defendant moves for summary judgment, arguing that the negligence and strict liability claims are barred by the statute of limitations, and the unjust enrichment claim stands or falls with the others.

The parties appear to agree that plaintiff's tort claims are governed by Illinois law and that the applicable limitations period is two years. *See* 735 ILCS 5/13-213 (products liability), 735 ILCS 5/13-202 (personal injury); *see also Doe v. Hastert*, 133 N.E.3d 1249, 1255 (Ill. App. Ct. 2019) (applying two-year statute of limitations of 735 ILCS 5/13-202 to negligent infliction of emotional distress claims). Under Illinois law, the general rule is that "a cause of action for personal injuries accrues when the plaintiff suffers injury." *Golla v. Gen. Motors Corp.*, 657 N.E.2d 894, 898 (Ill. 1995). However, this general rule has "harsh consequences" for plaintiffs who are not immediately aware of their injury, so Illinois courts have adopted—and, in the case of some statutes, the legislature has codified—a "discovery rule." *Id.* The discovery rule is "intended to encourage diligent investigation on the part of potential plaintiffs without foreclosing claims of

which plaintiffs could not have been aware." *Mitsias v. I-Flow Corp.*, 959 N.E.2d 94, 100 (Ill. App. Ct. 2011) (citing *Nolan v. Johns-Manville Asbestos*, 421 N.E.2d 864, 868 (Ill. 1981)). Toward that end, the discovery rule "postpone[s] the commencement of the relevant statute of limitations until the injured plaintiff knows or reasonably should know that he has been injured and that his injury was wrongfully caused." *Golla*, 657 N.E.2d at 898; *see* 735 ILCS 5/13-213 ("the plaintiff may bring an action within 2 years after the date on which the claimant knew, or through the use of reasonable diligence should have known, of the existence of the personal injury").

"The notion of 'wrongful cause,' as it has been developed by courts in Illinois, has two elements: that of cause and that of wrongfulness." *Mitsias*, 959 N.E.2d at 101. To satisfy the first element, the plaintiff must "have sufficient information to conclude that her injury was caused by the acts of another," rather than by "some non-negligent organic cause." *Id.* "As for the element of wrongfulness, an injured plaintiff should reasonably know that her injury is wrongfully caused, and the statute of limitations begins to run, as soon as she has sufficient information about her injury and its cause to spark inquiry in a reasonable person as to whether the conduct of the party who caused her injury might be legally actionable." *Id.* Once these elements are met, the discovery rule places on the plaintiff the burden of making a reasonably diligent inquiry into whether she has a viable cause of action. *Id.*

To trigger the limitations period, the plaintiff must possess "'sufficient information concerning an injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved,'" but she need not know of a "specific defendant's negligent act" or that any "actionable wrong was [actually] committed." *Hoffman v. Orthopedic Sys., Inc.*, 765 N.E.2d 116, 122 (Ill. App. Ct. 2002) (quoting *Knox Coll. v. Celotex Corp.*, 430 N.E.2d 976, 980-81 (Ill. 1981) (internal alteration marks omitted)); *see Nolan*, 421 N.E.2d at 868 ("We wish to

4

emphasize that the rule we announce is not the same as a rule which states that a cause of action accrues when a person knows or should know of both the injury and the defendants' negligent conduct. Not only is such a standard beyond the comprehension of the ordinary lay person to recognize, but it assumes a conclusion which must properly await legal determination."). The plaintiff need not know that "the defendant's conduct fits the technical legal definition of negligence or that all the legal elements of a particular cause of action are otherwise satisfied" to trigger the statute of limitations. *Mitsias*, 959 N.E.2d at 101-02. Rather, the limitations period begins as soon as she is "aware that her injury might have been 'wrongfully caused' in a general, non-technical sense." *Id.* at 105 (quoting *Knox*, 430 N.E.2d at 980).

If the plaintiff "is or should be aware of some possible fault on the part of the defendant," then she is obligated to make a reasonable investigation into whether a cause of action exists. *Mitsias*, 959 N.E.2d at 102. This is so even if the defendant does not at first seem to be the likeliest culprit among other potentially responsible parties, so long as it is possible to discover the defendant's potential culpability in the exercise of reasonable diligence. *See Hoffman*, 765 N.E.2d at 122 (reasoning that limitations period on products liability claim against medical equipment manufacturer commenced when plaintiff realized she had suffered a wrongfully caused injury during her surgery, regardless of the fact that her initial theory was that the injury was caused by medical malpractice rather than defective equipment). If the plaintiff learns enough about whether he "'has been hurt and who has inflicted the injury'" to put him in a position in which, even if he lacks expertise in the area, "'there are others who can tell him if he has been wronged, and he need only ask,'" then he has a duty to make inquiries, and the limitations period begins to run. *Mitsias*, 959 N.E.2d at 103 (quoting *United States v. Kubrick*, 444 U.S. 111, 122 (1979)).

Under these principles, plaintiff was on inquiry notice of a potentially wrongfully caused

5

injury as early as September 18, 2015, when Dr. Chatterji diagnosed her with recurrent pelvic organ prolapse and a mesh erosion and scheduled her for a follow-up surgery. At the latest, she was on inquiry notice after that surgery took place on January 7, 2016. Plaintiff herself admitted that she understood her diagnosis of recurrent prolapse and the scheduling of a second surgery to mean that her first surgery "didn't hold up." At that point, she knew or should have known that the Restorelle DirectFix product that had been surgically implanted into her body had not worked as intended, the mesh had begun to erode, and a second surgery was necessary to correct the problem. Based on that knowledge, she was or should have been aware of some possible fault on the part of the defendant, and she had sufficient information to put a reasonable person on inquiry to determine whether actionable conduct was involved. *See Freire v. Am. Med. Sys., Inc.*, No. 2:13-CV-9079, 2019 WL 1575187, at *3 (S.D.W. Va. Apr. 11, 2019) (reasoning, under Illinois law, that after implantation of pelvic mesh product in 2005, plaintiff "knew that her injury was wrongfully caused" "by 2007," when she learned "that there was an issue with her mesh implant leading up to her [first] revision surgery," during which additional pelvic mesh was implanted), *aff'd*, 797 F. App'x 782 (4th Cir. 2020); *see also Orso v. Bayer Corp.*, No. 04 C 0114, 2009 WL 249235, at *6 (N.D. Ill. Feb. 2, 2009) (limitations period began when doctor diagnosed plaintiff as having a "likely physiological addiction" to a nasal decongestant product and discussed the issue of "rebound congestion" with her, notwithstanding that plaintiff was unaware of her right to sue until subsequent encounter with man who described his own lawsuit against the product's manufacturer); *Schrott v. Bristol-Myers Squibb Co.*, No. 03 C 1522, 2003 WL 22425009, at *4 (N.D. Ill. Oct. 23, 2003) (where plaintiff experienced pain and other symptoms following breast implant surgery and required second surgery to replace her right implant, she "should have exercised reasonable diligence to determine whether actionable conduct was involved at the time

6

of her second surgery").

Plaintiff argues that Dr. Chatterji did not inform her at the September 18, 2015 visit—or at any time—that the pelvic mesh was at fault for her condition; to the contrary, she argues, he suggested from the beginning that erosion was a risk of any pelvic mesh implantation procedure and there may be a need for additional surgeries in the future. Plaintiff claims to have had no inkling that the mesh itself might be at the root of the problem until she saw a television advertisement about pelvic mesh litigation years later. Until seeing that ad, plaintiff contends, she reasonably believed that the problems stemmed not from the device but from her own "poor tissue quality," as Dr. Chatterji put it. (Pl.'s Resp. in Opp'n at 6, ECF No. 120; *see* Def.'s Mot. for Summ. J., Ex. 5, Dr. Chatterji Dep. at 97:1-98:7, ECF No. 87-6.)

Another court in this district has recently rejected a similar argument in a similar case. In *Stark v. Johnson & Johnson*, No. 18 CV 06609, 2020 WL 1914767, at *5 (N.D. Ill. Apr. 20, 2020), as in this case, the plaintiff complained of injury caused by erosion of a pelvic mesh implant. The device was implanted in February 2007, but the plaintiff had a sense that the surgery "didn't work," as she continued to suffer from pelvic pain and urinary incontinence. *Id.* at *2. She saw a urogynecologist, who told her that the mesh had "shifted and moved," and she had a second surgery in May 2008, during which the urogynecologist observed the erosion of the mesh and subsequently informed plaintiff of it. In 2015, she saw another doctor about continued urinary incontinence, and this doctor performed a cystoscopy, finding that strands of mesh had eroded into her urethra. The plaintiff filed suit, however, only after a friend suggested in 2018 that she see an attorney who specialized in pelvic mesh litigation. The plaintiff claimed that none of her physicians had attributed her injury to the mesh and she had reasonably believed that the problems were due to her Ehlers-Danlos Syndrome, a connective tissue disorder resulting in weakened tissues.

The court explained that the plaintiff "arguably" knew or should have known that "she was injured and that her injury was wrongfully caused" shortly after her February 2007 surgery, which she felt "didn't work." *Id.* at *4. Even if not, she was "certainly" on inquiry notice after the 2008 surgery, when the urogynecologist informed her of the erosion. *Id.* "[A]t the latest," she was on inquiry notice by the time of the 2015 procedure. *Id.* (citing *Freire*, 2019 WL 1575187, at *3). With respect to the argument that her physicians had not told her that the mesh was at fault, the court explained that "'Illinois case law suggests that, when a plaintiff has knowledge of an injury, an accurate medical diagnosis is irrelevant to the issue of whether a plaintiff is on notice of its exact wrongful cause.'" *Id.* at *5 (quoting *Orso*, 2009 WL 249235, at *5 (citing, *e.g.*, *Witherell v. Weimer*, 421 N.E.2d 869, 874-75 (Ill. 1981) (doctor's denial that the birth control pill caused plaintiff's injury did not toll the statute of limitations against the drug manufacturer)). Rather, the court explained, "Illinois courts have repeatedly held that definitive knowledge of causation"— *i.e.*, knowledge of "'a specific defendant's negligent act'" or a specific "'actionable wrong'"—"is not required." *Stark*, 2020 WL 1914767, at *5 (quoting *Hoffman*, 765 N.E.2d at 122, and citing *Curtis v. Mentor Worldwide, LLC*, 543 F. App'x 901, 903 (11th Cir. 2013) (applying Illinois law in similar context of erosion of suburethral sling implanted to relieve stress urinary incontinence) ("The Supreme Court of Illinois . . . has rejected the notion that a cause of action accrues only when the defendant's negligent conduct is known.") (citing *Nolan*, 421 N.E.2d at 868)).

This Court agrees with the reasoning of *Stark*. Under Illinois law, a plaintiff is on inquiry notice and the limitations period begins to run as soon as he is aware of having suffered a wrongfully caused injury, even if he does not know or is mistaken about which of certain potentially responsible parties' actions is the true cause, *see Hoffman*, 765 N.E.2d at 122, so long as he has at least enough information to learn "of some possible fault on the part of the defendant,"

8

*Mitsias*, 959 N.E.2d at 102. Further, the fact that a treating physician may have "'incompetently or mistakenly told [the plaintiff] that he does not have a case,'" the Illinois Supreme Court has explained, provides "'no sound reason for visiting the consequences of such error on [a products liability] defendant by delaying the accrual of the claim until the plaintiff is otherwise informed.'" *Witherell*, 421 N.E.2d at 875 (quoting *Kubrick*, 444 U.S. at 124). Thus, in cases such as *Stark* and this case, the commencement of the limitations period does not necessarily turn on when or whether treating physicians specifically ascribe the failure of the surgical implantation to the implant itself. *See Moore v. Mount Sinai Hosp. Med. Ctr. of Chi.*, 2020 IL App (1st) 190321-U, ¶¶ 9-11, 28, 36-38 (suggesting that limitations period commenced long before treating physician cited possibility of "central mesh failure," given that, two years prior, plaintiff had been forced to "return[] to [the hospital] to treat complications from the hernia procedure in which [the physician] used [the defendant's] mesh product").[2] What matters is whether, under the relevant facts and circumstances, the plaintiff is or should be aware of having suffered a wrongfully caused injury and of at least some possible fault on the part of the defendant.

Here, plaintiff and her physician both recognized by January 2016 that the implantation of defendant's Restorelle DirectFix product had failed to correct the problem for which it was introduced, requiring a second surgery. Plaintiff recognized that the implantation surgery "didn't hold up," and Dr. Chatterji scheduled plaintiff for a revision surgery and robotic sacrocolpopexy, which he testified is what he "usually do[es] when the vaginal repair fails." (*See* Dr. Chatterji Dep. at 69:8-9, ECF No. 87-6.) Not only had plaintiff's pelvic organ prolapse recurred, but the vaginal mesh had begun to erode—and as defendant points out, the incidence of mesh erosion is "central"

---

[2] The Court recognizes that *Moore* is an unpublished, nonprecedential decision of the Illinois Appellate Court. The Court cites it here not for its precedential value but merely for the persuasive value of its reasoning, in much the same manner that the Court cites other district court decisions.

to plaintiff's claims in this suit. (Def.'s Reply Br. at 6, ECF No. 136; *see* 2d Am. Long Form Master Compl.; *see also* Report of Pl.'s Expert Rosenzweig, ECF No. 96-7 (opining that mesh degradation caused erosion and other symptoms and problems).) At the point that a corrective revision surgery became necessary due to erosion, it was incumbent on plaintiff to investigate why the initial surgical repair failed and the erosion occurred, including whether it was the surgical implant, the surgeon, or some other party who was at fault. Even a cursory investigation in 2015 or 2016, let alone a reasonably diligent one, would have revealed defendant's potential fault, given that pelvic mesh litigation took off some off years before then. *See, e.g., Freire*, 2019 WL 1575187, at *1 (Illinois plaintiff filed suit after seeing ad for "transvaginal mesh litigation" in 2013); *Curtis*, 543 F. App'x at 902 (Illinois plaintiff filed suit after seeing television ad for "problems and symptoms from transvaginal mesh surgeries" in 2010 or 2011); *cf. Mitsias*, 959 N.E. 2d at 104 (products liability claim was not untimely where plaintiff's "delay in bringing [it] was not due to any lack of diligence on her part, but rather to the fact that the scientific community was not aware of the dangers associated with [the product]" until several years after plaintiff's injury occurred).

Plaintiff states that she only realized that her injuries were caused by the acts of another when she connected the television commercial about pelvic mesh litigation to her "back to back" surgeries; she testified that she just "wanted this over with." (*See* Pl.'s Resp. in Opp'n at 5 (citing Pl.'s Dep. at 115:7-16.)) It is unclear precisely when she saw the ad and made the connection,[3] but to the extent that plaintiff is arguing that she did not actually realize that the mesh was at fault for her medical problems until after her fourth surgery, it does not follow that she could or should

---

[3] Plaintiff testified that she saw the television commercial for pelvic mesh litigation around the time of her "back to back" surgeries. It is not clear from the deposition transcript which surgeries she was referring to. She argues in her brief that she was referring to the April 2017 and April 2018 surgeries, but plaintiff also testified that she first contacted her lawyers "at least three" years before her deposition in June 2019, *i.e.*, sometime in the spring of 2016 at the latest. (*See* Pl.'s Dep. at 114:4-6.) Regardless of this apparent discrepancy, the Court assumes at this stage that plaintiff did not see the television commercial until 2018.

10

not have realized it, in the exercise of reasonable diligence, after the second. Once the plaintiff has enough information to reasonably permit her to determine that she suffered an injury that was wrongfully caused by another, the limitations period begins to run—even if the plaintiff remains unaware of "the full extent of his or her injuries." *Hoffman*, 765 N.E.2d at 121-22; *see Golla*, 657 N.E.2d at 901 ("Thus, the present case involves, not a plaintiff who failed to discover *any* injury, but a plaintiff who failed to discover the full extent of her injuries before the statute of limitations expired. There is no requirement that a plaintiff must discover the full extent of her injuries before the statute of limitations begins to run."); *Wilson v. Devonshire Realty of Danville*, 718 N.E.2d 700, 705 (Ill. App. Ct. 1999) ("Once plaintiff was aware of *any* injury and its possible cause, she was aware of her right to sue.") (citing *Golla*). Even if plaintiff did not become fed up until after the fourth surgery, she had enough information by the time of the second surgery in January 2016 to put her on inquiry notice of potential products liability claims against defendant arising out of the mesh implantation and the mesh erosion that necessitated the revision surgery.

This result is consistent not only with the above-cited cases but also with certain similar pelvic mesh cases in other jurisdictions. "In pelvic mesh cases specifically, district courts have held that a plaintiff triggers the statute of limitations on the date of a second[,] corrective procedure that occurs shortly after the initial mesh procedure." *Villarreal v. Am. Med. Sys., Inc.*, No. CV201641PSGPLAX, 2020 WL 4390372, at *3 (C.D. Cal. May 6, 2020) (reasoning, under California law, that after plaintiff's implantation procedure in July 2007 required a "corrective procedure" in June 2008, plaintiff had "ample reason to suspect that pelvic mesh caused her pain in June 2008" and "the statute of limitations bar[red] her claims because she did not file them until four years later"); *see also Mitsias*, 959 N.E.2d at 109 (relying on California case law and finding California's discovery rule to be "in line with the discovery rule as it has developed in Illinois").

11

Here, it was clear that the implantation procedure failed and the mesh began to erode in September 2015, and even if plaintiff did not know then the precise cause of the failure and erosion, she had "sufficient information about her injury and its cause to spark inquiry in a reasonable person" as to whether legally actionable conduct was involved, which triggered the limitations period under the discovery rule. *See Mitsias*, 959 N.E.2d at 101; *see also Kennedy v. Ethicon, Inc.*, No. 5:20-CV-00185, 2020 WL 4050459, at *16 (E.D. Pa. July 20, 2020) ("Accordingly, [plaintiff] did not need to know that her injuries were caused by a *defect* in the mesh or by any *tortious* conduct of Defendants for the limitations period to be triggered. Rather, she was only required to have actual or constructive knowledge of her injury . . . and a link to a potential cause — erosion of her pelvic mesh.") (applying Pennsylvania law).

Thus, the statute of limitations began to run in January 2016 at the latest, and, because plaintiff did not file her complaint until April 25, 2018, her tort claims are time-barred. Because the tort claims do not survive summary judgment, the unjust enrichment claim likewise fails. *See Cleary v. Phillip Morris Inc.*, 656 F.3d 511, 517 (7th Cir.2011) ("[I]f an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim—and, of course, unjust enrichment will stand or fall with the related claim."); *see also Sidney Hillman Health Ctr., of Rochester v. Abbott Labs.*, 64 F. Supp. 3d 1146, 1158 (N.D. Ill. 2014) (applying this rule where related tort claim was found to be time-barred), *rev'd on other grounds*, 782 F.3d 922 (7th Cir. 2015). Because plaintiff's substantive claims are time-barred, the Court need not reach the parties' arguments on the merits of the claims.

## **CONCLUSION**

For the foregoing reasons, defendant's motion for summary judgment [87] is granted. The parties' *Daubert* motions [90, 92, 94, 96, 98, 100, 102, 104, 106] are denied as moot. Civil case terminated.

**SO ORDERED.**

                                        **ENTERED: September 18, 2020**

                                        **HON. JORGE ALONSO**
                                        **United States District Judge**